UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| PARKRIDGE MEDICAL CENTER, INC., | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| | ) | 1:12-CV-124 |
| v. | ) | |
| | ) | Judge Curtis L. Collier |
| | ) | |
| CPC LOGISTICS, INC. GROUP BENEFIT | ) | |
| PLAN and UMR, | ) | |
| | ) | |
| *Defendants*. | ) | |

## M E M O R A N D U M

Plaintiff Parkridge Medical Center, Inc. ("Plaintiff") brings this action against Defendants

CPC Logistics Inc. Group Benefit Plan and UMR ("Defendants") to recover funds for services

performed for a patient covered under a plan, which itself is under the purview of the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* The Court issued

a scheduling order in which it deemed all parties to have moved for judgment in their respective

favor on the administrative record (Court File No. 8). Plaintiff filed a memorandum in support of

its claim (Court File No. 21), to which Defendants responded (Court File No. 24). Plaintiff

subsequently replied to Defendant's response (Court File No. 25). The Court held oral arguments

on Plaintiff's motion on July 24, 2013, and all parties were in attendance. After considering the

relevant law and the parties' arguments, the Court will **DENY** Plaintiff's motion for judgment on

the ERISA record (Court File No. 21).

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. The Plan[1]

Plaintiff rendered medical services to a patient who is the wife of an employee of CPC Logistics, Inc. and was covered under the CPC Logistics, Inc. Group Benefit Plan ("the Plan"). CPC Logisitcs is the Plan Administrator and the Plan is self funded. UMR is a Third-Party Administrator retained "to process claims and handle other duties" (Administrative Record ("AR") 442). CPC Logistics conferred onto itself "sole discretion" in determining the "appropriate courses of action in light of the reason and purpose for which th[e] Plan is established and maintained" (*id.* at 444). This includes "full and sole discretionary authority to interpret all plan documents . . . , and make all interpretive and factual determinations as to whether any individual is entitled to receive any benefit under the terms of th[e] Plan."

CPC Logistics did, however, "delegate certain responsibilities to the Third Party Administrators for this Plan." As such, the Plan specifies that "[a]ny interpretation, determination or other action of the Plan Administrator or the Third Party Administrators shall be subject to review only if a court of proper jurisdiction determines its action is arbitrary or capricious or otherwise a clear abuse of discretion." The Plan further states "[a]ccepting any benefits or making any claim for benefits under th[e] Plan constitutes agreement with and consent to any decisions that the Plan Administrator or the Third Party Administrators make, in its sole discretion, and further, means that the Covered Person consents to the limited standard and scope of review afforded under law."

The Plan provides coverage of "Covered Benefits if services are authorized by a Physician

---

[1] The Court has been provided copies of the Summary Plan Description ("SPD") for both 2009 and 2010 (*see* Administrative Record ("AR") 177, 442). The disputed coverage overlaps those years and both would be effective for different portions of that coverage. Neither party has pointed to any distinction between the two that is relevant to the Court's determination.

2

and are necessary for the treatment of an Illness or Injury, subject to any limits, maximums, exclusions or other Plan provisions" (*id.* at 506). "The Plan does not provide coverage for services if medical evidence shows that treatment is not expected to resolve, improve, or stabilize the Covered Person's condition, or if a plateau has been reached in terms of improvement from such services" (*id.*).

The Plan defines "Covered Benefit" as "treatment, services, supplies, medicines or facilities necessary and appropriate for the diagnosis, care or treatment of an Illness or Injury and that meet clinical Eligibility for Coverage as determined by the Plan" (*id.* at 551). Although "consideration is given to the customary practice of providers in the community or field of specialty. . . . [,] the fact that a provider may prescribe, order, recommend or approve a service, supply, medicine or facility does not, of itself, make the service a Covered Benefit." The Plan also excludes experimental or investigational treatment, defined as "[s]ervices, supplies, medicines, treatment, facilities or equipment which the Plan determines are Experimental or Investigational, including administrative services associated with Experimental or Investigational treatment." "Experimental or Investigational" is further defined as

> any drug, service, supply, care and/or treatment that, at the time provided or sought
> to be provided, is not recognized as conforming to accepted medical practice or to
> be a safe, effective standard of medical practice for a particular condition. This
> includes, but is not limited to:
> • Items within the research, Investigational or Experimental stage of
>   development or performed within or restricted to use in Phase I, II , or III
>   clinical trials (unless identified as a covered service elsewhere);
> • Items that do not have strong research-based evidence to permit conclusions
>   and/or clearly define long-term effects and impact on health outcomes (have
>   not yet shown to be consistently effective for the diagnosis or treatment of
>   the specific condition for which it is sought). Strong research-based evidence
>   is identified as peer-reviewed, published data derived from multiple, large,
>   human randomized controlled clinical trials OR at least one or more large
>   controlled national multi-center population-based studies;

- Items based on anecdotal and Unproven evidence (literature consists only of case studies or uncontrolled trials), ie:, lacks scientific validity, but may be common practice within select practitioner groups even though safety and efficacy is not clearly established;
- Items which have been identified through research-based evidence to not be effective for a medical condition and/or to not have a beneficial effect on health outcomes.

(*Id.* at 559-60).[2]

## B. Factual Background

Plaintiff rendered medical services to the patient from September 2009 to January 2011. The patient's doctor, Dr. Jitendra G. Gandhi, began seeing the patient in 2008. Dr. Gandhi performed a bone marrow biopsy and a computed tomography ("CT") scan of the patient's chest, abdomen, and pelvis. Dr. Gandhi concluded the patient had idiopathic thrombocytopenic purpura ("ITP"). In November 2009, the patient began outpatient treatments of Rituxan and intravenous immunoglobulin, also known as gammaglobulin ("IVIG"). Dr. Gandhi determined the treatment was medically necessary in order to maintain a stable range of platelets and avoid a splenectomy.

Plaintiff sought precertification from UMR, which Plaintiff contends was received (Court File No. 21-3, p. 2), and Plaintiff treated the patient. The patient assigned her benefits to Plaintiff, who was then authorized to recover benefits available under the Plan. The parties disagree whether this was sufficient under the Plan's procedures to establish Plaintiff as an authorized representative. Regardless, Defendants never paid Plaintiff for the care it provided the patient from November 16, 2009 to January 31, 2010. After this time period, the patient was covered under Medicare, and subsequent treatment has been claimed through that program. The unpaid charges for services

---

[2] "Experimental or Investigational" is defined differently in the 2009 SPD (AR 294-95). However, the distinctions do not appear to be relevant here, nor has Plaintiff suggested any distinctions are relevant.

rendered in the time period relevant here is $273,560. However, a contractual discount was applied, and the outstanding balance is $171,140.20.

After Plaintiff initially sought reimbursement from Defendants, UMR sought further information regarding the patient. Between March and July 2010, UMR sought the patient's medical records (AR 8); the patient's history and assessment, treatment plan, and result of lab tests in both a letter (AR 11) and in a telephone message (AR 13); and spoke with an employee at Dr. Gandhi's office who agreed to forward on the information (AR 793). On July 14, 2010, UMR received medical records from Dr. Gandhi's office.

After receiving the records, Dr. Arnold Wax, Board Certified in Oncology and Internal Medicine, reviewed the claims and determined the gammaglobulin met the plan language as it is "a standard of care therapy for [ITP]" (AR 151). However, he concluded the Rituxan (rituximab) "does not meet the plan language, as it is investigational/experimental and is not FDA approved for ITP." Typically, Dr. Wax advised, Rituxan is used for "steroid refractory or steroid dependent ITP." Dr. Wax noted the "off-label" use was based upon "anecdotal clinical trials that suggest its benefit" and that the patient "did have benefit for this particular therapy," but regardless of its benefit the use was still experimental. Dr. Wax also noted "the records are not convincing that this patient has ITP," because her bone marrow study "did not describe megakaryocytic hyperplasia"; her spleen size is "either at the upper limit of normal or enlarged" and "[b]y definition, patients with ITP do not have splenomegaly"; and "the indication is not to treat ITP unless the patient's platelet count drops below 30,000 or the patient is actively bruising, bleeding, or requiring surgery." He concluded the treatment was therefore not medically necessary. After Dr. Wax finished his assessment, it was approved by Jan Deichler, RN, CCM.

5

On July 16, 2010, after reviewing Dr. Wax's opinion, UMR denied the claims as "not medically necessary" (AR 147). UMR advised Plaintiff the bone marrow study, the CT scan of the patient's spleen, and the patient's platelet count suggested she did not have ITP. UMR also noted Rituxan was experimental for ITP and accordingly not covered by the Plan. The letter referred Plaintiff to the CPC Logistical Master Plan Document or Summary Plan Description ("SPD") for information on appeal rights and informed Plaintiff it could seek review under ERISA.

Plaintiff claims it appealed this conclusion, and points to AR 27, where UMR's log notes reflect an appeal of claim N15900239 was received in August 2010 (*see also* Court File No. 24-2, August 9, 2010 Appeal). However, as UMR demonstrates, claim N15900239 refers to services rendered between May 10, 2010 and May 31, 2010, outside of the time period at issue in this case. Another appeal was also submitted for services performed in June 2010. Plaintiff appealed other claims denied in the July 16, 2010 determination on October 15, 2010 (AR 38, 40). It submitted thirty-one pages of records related to the claim at issue. In November 2010, a UMR reviewer stated the new records were "infusion records" and not "new clinical information" and the original denial was upheld (AR 40).

On December 21, 2010 Nashville Shared Services Center filed a "formal appeal," the second level of appeal, with United Healthcare[3] claiming "not all information was received on 2nd level appeal" and offered further documentation (AR 125). The claim number for this appeal does correspond to one of the claim numbers from the July 16, 2010 determination and covers December 2009, which is within the time period of claims at issue in this case. Included in the documentation

---

[3] Neither party discusses why Plaintiff sent this appeal to United Healthcare, or how United Healthcare is involved in this case.

6

was a letter from Dr. Gandhi and documentation of treatment in June 2010, after the time period at issue here or in the appeal. Dr. Gandhi's letter did refer to the treatment as medically necessary. The records indicate the treatment was necessary in June 2010. It also notes the patient's platelet count decreased from 51,000 on June 7th to 26,000 on June 28th. Based on peer review by Dr. Don Hill, Defendants approved the claim for treatment for this period. Dr. Hill concluded the only time Rituxan and gammaglobulin were appropriate treatments was on June 28, 2010.

In January 2011, in apparent response to the December 2010 appeal, UMR sent Plaintiff's claims for a second medical review. Dr. Lee Hartner, Board Certified in Internal Medicine with a sub-specialty certificate in hematology and a sub-specialty in medical oncology, reviewed the record. He concluded IVIG and Rituxan were not medically necessary between November 2009 and October 2010 (AR 110). Dr. Hartner concluded IVIG is only recommended for instances when "rapid platelet response is needed," but concluded the "records in this case do not specifically indicate that this patient met any of those criteria [on which IVIG would be necessary]." He also concluded, when Rituxan was prescribed in this case, there were ongoing clinical trials, which suggests its use was experimental or investigational. Deichler reviewed the opinion and provided a summary, but changed the dates when the procedure was not medically necessary to September 2009 to December 2010. On February 11, 2011, UMR sent Plaintiff a letter confirming its prior decision (*id.* at 113). At least one of the claim numbers involved in this denial corresponds with the claim in the December 21, 2010 appeal.

Following the second denial, Plaintiff sought further information regarding the medical professional who submitted the opinion, including (1) name and credentials; (2) outline of the records reviewed and a description of the records that would be necessary to approve the treatment;

(3) copies of expert medical opinions; and (4) a copy of the SPD (AR 98-99). On April 1, 2011, UMR confirmed receipt of Plaintiff's request (AR 97). On April 13, 2011, UMR sent Plaintiff the requested materials. However, Plaintiff contends no medical records were enclosed. The letter also indicates UMR did not have the name of the reviewing physician but noted reviews were completed by the MES Group, a licensed, URAC-accredited medical review organization. Plaintiff states it then sought the information again on multiple occasions, but that UMR stated all documentation had been sent.

Plaintiff filed the instant action on April 13, 2012. Pursuant to the Court's order (Court File No. 8), the parties were presumed to have moved for judgment in their favor and the Court submitted a briefing schedule. Plaintiff submitted its brief on December 31, 2012. Defendant responded on January 22, 2013, and Plaintiff replied to Defendant's response on January 29, 2013.

Plaintiff's complaint lists four counts: (1) violations of the CFR; (2) breach of contract; (3) promissory estoppel; and (4) negligent misrepresentation. Plaintiff's brief, however, focuses on the argument Defendants did not provide a full and fair review of its claim. In support of this argument, Plaintiff notes it never received all the medical evidence relied on by Defendant in determining the patient's treatment was not medically necessary and was experimental.

## II.     STANDARD OF REVIEW

ERISA does not itself specify a judicial standard of review. The Supreme Court, however, has established a challenge to an ERISA plan's benefits determination "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When discretionary authority is granted to the Plan

8

Administrator the "arbitrary and capricious standard of review is appropriate." *Borda v. Hardy, Lewis, Pollard, & Page, P.C.*, 138 F.3d 1062, 1066 (6th Cir. 1998) (quotation marks and citation omitted). However, "even when the plan documents confer discretionary authority on the plan administrator, when the benefits decision 'is made by a body other than the one authorized by the procedures set forth in the benefits plan,' federal courts review the benefits decision *de novo*.'" *Shelby County Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 365 (6th Cir. 2009).

The parties dispute whether the Court should apply *de novo* or arbitrary and capricious review in this case. As noted above, CPC Logisitcs is the Plan Administrator and the Plan is self funded. CPC Logistics conferred onto itself "sole discretion" in determining the "appropriate courses of action in light of the reason and purpose for which th[e] Plan is established and maintained" (AR 444). This includes "full and sole discretionary authority to interpret all plan documents . . . , and make all interpretive and factual determinations as to whether any individual is entitled to receive any benefit under the terms of th[e] Plan."

CPC Logistics did, however, "delegate certain responsibilities to the Third Party Administrators for this Plan." This delegation includes "process[ing] claims and handl[ing] other duties" for the Plan. The Plan provides, however, the Third Party Administrators are not liable under the Plan because "they are solely claims paying agents for the Plan Administrator." It also states, under "Type of Administration" that "UMR provides administrative services such as claim payments for medical and pharmacy claims." Important to Defendants' argument, however, the Plan specifies that "[a]ny interpretation, determination or other action of the Plan Administrator or the Third Party Administrators shall be subject to review only if a court of proper jurisdiction determines its action is arbitrary or capricious or otherwise a clear abuse of discretion." The Plan further states

9

"[a]ccepting any benefits or making any claim for benefits under th[e] Plan constitutes agreement with and consent to any decisions that the Plan Administrator or the Third Party Administrators make, in its sole discretion, and further, means that the Covered Person consents to the limited standard and scope of review afforded under law."

Defendants argue this provision is sufficient to limit the Court's discretion to arbitrary and capricious review. Plaintiff, on the other hand, argues the Plan makes CPC Logistics the sole fiduciary and Plan Administrator, and accordingly, because the decision was made by UMR, the Court must review the decision under a *de novo* standard.

In *Majestic Star*, the Sixth Circuit held, because the third party who actually performed the benefits review and determination was not explicitly granted discretionary authority, the decision should be reviewed *de novo*. *Majestic Star*, 581 F.3d at 367. As was the case in *Majestic Star*, here, UMR communicated with Plaintiff regarding its claim, issued the decision letter, considered the appeal, and there is no evidence CPC Logistics was involved in the decision to deny Plaintiff's claim. Moreover, the Plan itself does not confer discretionary authority on both CPC Logistics and UMR, but retains in CPC Logistics "full and *sole* discretionary authority to interpret all plan documents" and to make all "interpretive and factual determinations" regarding the availability of benefits under the Plan (AR 444) (emphasis added). *Cf. Lubeski v. Metro. Life Ins. Co.*, No. 11-15404, 2012 WL 5389900, at *4 (E.D. Mich. Nov. 5, 2012) (distinguishing *Majestic Star* where the plan documents made it "clear [the third party administrator] is a Plan fiduciary" because the plan specified administration was to be performed by the third party administrator and conferred discretionary authority on "other Plan fiduciaries"). Without the provision of the Plan that explicitly limits review of both CPC Logistic's and any Third Party Administrator's decisions to the arbitrary

and capricious standard, the standard of review in this case would be *de novo*.

Defendants argue, however, the Plan's attempt to limit review of UMR's decisions is effective. In considering the standard of review for ERISA, the Supreme Court analogized to trust law because both the language of the statute itself and the legislative history confirm courts should consider the "principles of trust law" in determining the appropriate standard of review. *Firestone Tire*, 489 U.S. at 110-11. The Court cited to the Restatement (Second) of Trusts § 187 (1959), which states "[w]here discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court except to prevent an abuse by the trustee of his discretion." Relevant here, the Court concluded "[c]onsistent with established principles of trust law, we hold that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115. This is a recognition that "'[t]he extent of the duties and powers of a trustee is determined by the rules of law that are applicable to the situation, and not the rules that the trustee or his attorney believes to be applicable, and by the terms of the trust as the court may interpret them, and not as they may be interpreted by the trustee himself or by his attorney.'" *Id.* at 112 (quoting 3 W. Fratcher, Scott on Trusts § 201, at 221) (emphasis omitted). Then where discretion to interpret the Plan is not conferred on a plan administrator, the Court should interpret the plan itself, under *de novo* review. The Sixth Circuit has also recognized *de novo* review as the "default rule" only to be limited by a grant of discretion. *See Anderson v. Great West Life Assurance Co.*, 942 F.2d 392, 395 (6th Cir. 1991). Based on the standard as explained by the Supreme Court, whether Defendants' attempt to limit the standard of review was effective would be a close question.

11

However, the Court is not required to decide that question in this case. Part of the confusion in the parties' arguments, and in general with this case, is the lack of clarity in the claim actually being made. The distinction between a *de novo* and arbitrary and capricious standard of review is a relevant inquiry in a claim for benefits under 29 U.S.C. § 1132(a)(1)(B), which empowers a "participant or beneficiary" to bring a civil action "to recover benefits due to him under the terms of his plan." Large portions of Defendants' brief focus on this question, and Defendants argue UMR's decision to deny benefits was not arbitrary or capricious. Plaintiff, for its part, states in its brief it "sues under an Assignment of Benefits received from the Patient at the time of her hospitalization under 29 U.S.C. § 1132(a)(1)(B) which provides that an action may be brought by a participant or beneficiary to recover benefits due under the terms of the plan." However, Plaintiff's brief states the "issue" as whether "defendants provide[d] a full and fair review of the claims for treatment provided by PMC to the plan participant from November 16, 2009 to January 31, 2010." The brief indeed focuses on this point, rather than seeking review of the substantive decision.

Most important, the complaint does not invoke § 1132(a)(1)(B). Rather, the complaint notes a number of violations of the CFR provisions relevant to procedures a fiduciary must provide in reviewing the denial of an ERISA benefits claim. The complaint also states three state law claims relevant to UMR's precertification of the patient's coverage. However, the state law counts disclaim association with the underlying insurance plan, alleging instead that an independent contract was formed between the parties.

Although the complaint does not explicitly cite the ERISA provision on which Plaintiff bases its claim, Plaintiff's brief submits the argument UMR did not provide a "full and fair review" of its

12

claims, which is required by 29 U.S.C. § 1133. The CFR provisions cited in its complaint are also relevant to this determination, in that 29 C.F.R § 2560.503-1 is the implementing regulation for § 1133. Accordingly, a generous reading of the complaint establishes count one as alleging UMR denied benefits without "a reasonable opportunity . . . for a full and fair review by the appropriate named fiduciary of the decision denying the claim" in violation of 29 U.S.C. § 1133.[4] At oral argument, Plaintiff's counsel conceded the thrust of the complaint is Defendants' failure to provide a full and fair review of the denial of Plaintiff's initial claim for benefits. Such a claim presents a "legal question of whether the procedure employed by the fiduciary in denying the claim meets the requirements of § 1133" and is reviewed *de novo*. *McCartha v. Nat'l City Corp.*, 419 F.3d 437, 444 (6th Cir. 2005); *see also Smith v. Columbia Gas of Ohio Grp. Med. Benefits Plan*, 624 F. Supp. 2d 844, 858 (S.D. Ohio 2009) ("Although the arbitrary and capricious standard applies to Defendants' termination of Plaintiff['s] [] benefits, with respect to Plaintiff['s] [] 29 U.S.C. § 1133 claim, the appropriate standard of review is *de novo*."). Although the parties dispute the standard of review, a careful review of the complaint reveals the appropriate standard is *de novo*.

## III.    DISCUSSION

The complaint states four causes of action: (1) violations of the CFR; (2) breach of contract; (3) promissory estoppel; and (4) negligent misrepresentation. Aside from the first claim, the second

---

[4] Although § 1133 is the substantive requirement, Plaintiff's action would be brought pursuant to 29 U.S.C. § 1132(a)(3), which provides "[a] civil action may be brought . . . by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." *See Stuhlreyer v. Armco, Inc.*, 12 F.3d 75, 78 n.2 (6th Cir. 1993) ("Section 1132(a)(3) allows a party to bring a civil action for relief when the requirements of § 1133 are not met.") (citing *Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129, 1135 (7th Cir.1992)).

through fourth claims are not ERISA claims.

## A. ERISA claim

### 1. Authorized Representative

Before considering the merits of the claim, the Court must first determine whether Plaintiff is entitled to make a claim on the patient's behalf at all. Defendant argues the assignment of benefits, appointing Plaintiff the patient's authorized representative, did not comport with the provisions of the Plan and was thus ineffective.

Generally, health care providers cannot bring civil actions under 29 U.S.C. § 1132 because they are not "participant[s]" or "beneficiar[ies]." However, a provider may obtain derivative standing as a beneficiary if it receives an assignment of benefits from a patient who is a participant in the plan. *See Cromwell v. Equicor-Equitable HCA Corp.*, 944 F.2d 1272, 1277 (6th Cir. 1991). Moreover, an employee benefit plan must not "preclude an authorized representative of a claimant from acting on behalf of such claimant in pursuing a benefit claim or appeal of an adverse benefit determination." 29 C.F.R § 2560.503-1(b)(4). However, "a plan may establish reasonable procedures for determining whether an individual has been authorized to act on behalf of a claimant." *Id.* Here, the Plan provided

> [i]f a Covered Person chooses to use an Authorized Representative, the Covered Person must submit a written letter to the Plan stating the following: The name of the Authorized Representative, the date and duration of the appointment and any other pertinent information. In addition, the Covered Person must agree to grant their Authorized Representative access to their Protected Health Information. This letter must be signed by the Covered Person to be considered official.

(AR 539).

Defendants argue the letter in this case was insufficient to confer authorized representative status on Plaintiff because it was a "generic assignment form" and did not identify the duration of

14

the appointment or the "specific claim/request Plaintiff was entitled to pursue." Moreover, the only assignment form in the record related to the time period at issue is dated December 1, 2009, after the November claims in this case. Defendants also point to the Department of Labor's ("DOL") interpretation of when a claimant has successfully authorized a representative. In a FAQ produced by the DOL related to § 2560.503-1, the DOL states an assignment of benefits is generally not sufficient to designate an authorized representative because "[a]n assignment of benefits by a claimant is generally limited to assignment of the claimant's right to receive a benefit payment under the terms of the plan." FAQs About the Benefit Claims Procedure Regulation at B–2, *available* at http://www.dol.gov/ebsa/pdf/CAGHDP.pdf. The DOL notes assignments of benefits are not typically "grants of authority to act on a claimants behalf." Regardless, the DOL cautions, "the validity of a designation of an authorized representative will depend on whether the designation has been made in accordance with the procedures established by the plan, if any."

The assignment in this case contained sufficient language to comply with the procedures in the Plan. Although the assignment occurred in the context of an "assignment of benefits," the form submitted to UMR stated the patient

> hereby appoint[s] the hospital as [her] authorized representative to pursue, if it so chooses, all administrative remedies, claims and/or lawsuits on [her] behalf and at the hospital's election, against any responsible third party, medical insurer, or employer sponsored medical benefit plan for purposes of collecting any and all hospital benefits due [her] for the payment of the charges referred to in section 2 above [wherein the patient agreed to pay for the services rendered].

(AR 141). Nothing in the relevant provision of the Plan suggests a form does not constitute a "written letter" simply because it contains boilerplate language. Moreover, the above-quoted portion appears to appoint Plaintiff the patient's authorized representative indefinitely with respect to the services rendered, "at the hospital's election." This is corroborated by the context of the assignment

15

of benefits section, which "irrevocably assign[s] and transfer[s]" all the patient's rights to benefits to Plaintiff. With respect to Defendants' contention the "specific claim/request Plaintiff was entitled to pursue" was not properly identified by the assignment, the Court notes the assignment is part of a larger document consenting to outpatient procedures performed "during this outpatient episode of care."

One of Defendants' arguments regarding the appointment of Plaintiff as the patient's authorized representative is more troubling: The earliest form in the administrative record is from December 1, 2009, which postdates a portion of the care for which Plaintiff's claim was denied, of which it now argues UMR failed to offer a full and fair review. However, the Court is satisfied UMR treated Plaintiff as the patient's authorized representative as to all the claims currently at issue, and because UMR's denial letter did not state any such deficiency as a ground for denying the claim, such treatment is sufficient to waive whatever procedural deficiencies may have occurred. *See Harju v. Olson*, 709 F. Supp. 2d 699, 715-16 (D. Minn. 2010) (holding an organization had standing to request documents and bring administrative claims in part because the denial letter did not contend it was not an authorized representative, did not invoke any reasonable procedures under § 2560.503-1(b)(4), and there was no evidence to show defendants ever attempted to discern whether the organization had authorization). Further, because the Court concludes Defendants in fact provided a full and fair review of Plaintiff's claims, it is not necessary for the Court to determine ultimately which portions of the November 2009 to January 2010 services Plaintiff was properly authorized to represent the patient.

Accordingly, the Court concludes Plaintiff is the patient's authorized representative and may pursue its claim UMR failed to provide a full and fair review of its denial of Plaintiff's benefits

claims.

## 2. Violations of the CFR

Plaintiff's first count alleges violations of 29 CFR § 2560.503-1(g)(1)(v)(B) and (h)(3)(iii)-(v). As discussed above, a generous reading of Plaintiff's complaint reveals it seeks relief pursuant to 29 U.S.C. § 1132(a)(3) on the ground Plaintiff was not afforded a full and fair review of the denial of its claim as required by 29 U.S.C. § 1133. Section 1133 provides

> [i]n accordance with regulations of the Secretary, every employee benefit plan shall-
> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

*See also* 29 C.F.R. § 2560.503-1 (implementing regulation).

The "essential purpose" of this statute, as identified by the Sixth Circuit, is "(1) to notify the claimant of the specific reasons for a claim denial, and (2) to provide the claimant an opportunity to have that decision reviewed by the fiduciary." *Wenner v. Sun Life Assurance Co. of Can.*, 482 F.3d 878, 882 (6th Cir. 2007) (emphasis omitted). Courts employ a "substantial compliance" test to determine whether the requirements of § 1133 have been met, and "'consider[] all communications between an administrator and plan participant to determine whether the information provided was sufficient under the circumstances.'" *Id.* (quoting *Moore v. LaFayette Life Ins. Co.*, 458 F.3d 416, 436 (6th Cir. 2006)). Even if the requirements of § 1133 are not met by a particular communication, "[i]f the communications between the administrator and participant as a whole fulfill the twin purposes of § 1133, the administrator's decision will be upheld." *Id.*

The complaint alleges the following inadequacies in the review process: After the initial

17

denial of its claim, Plaintiff sought (a) a copy of the SPD; (b) the name and credentials of the medical professional who reviewed the records, 29 CFR § 2560.503-1(h)(3)(iv); (c) an outline of the specific records reviewed and a description of records that would be necessary to approve the treatment, 29 CFR § 2560.503-1(h)(3)(iii), (m)(8); and (d) copies of expert medical opinions secured by UMR regarding the treatment so the treating physician may respond. Although UMR responded with a copy of the SPD, Plaintiff claims it failed to provide the other requested information. Plaintiff sought the information six times to no avail.

The Court's task is not to determine whether UMR strictly complied with the regulations mandating certain procedures. Rather, the Court's task is to determine whether the communications between Plaintiff and UMR substantially complied with the twin purposes of § 1133.

As an initial matter, many of Plaintiff's appeals and requests for information relate to denials not at issue in this case. Plaintiff claims it appealed UMR's decision with respect to the relevant time period, and points to AR 27, where UMR's log notes reflect an appeal of claim N15900239 was received on August 10, 2010. However, claim N15900239 refers to services rendered between May 10, 2010 and May 31, 2010, outside of the time period at issue in this case. Another appeal was also submitted for services performed in June 2010. UMR's denial, however, specifically included the time period at issue. Additionally, Plaintiff's formal appeal referenced the denial for some of the services in the relevant time period (AR 125).

Regardless, UMR's procedures and communications substantially complied with § 1133. First, UMR was required to "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133. Here,

18

UMR explained its denial in an initial July 15, 2010 letter as follows:

> UMR has conducted a thorough review of your charges for claim[s] . . . for dates of service 11/16/09 - 05/24/10. The review included consultation with Physician Review network, a licensed, URAC accredited medical review organization, whose recommendation was considered in the final determination. This letter is to inform you that the decision was made to deny [the treatment] as not medically necessary and does not meet plan language. Documentation does not support that this patient has [ITP]. The patient's bone marrow study did not describe megakaryocytic hyperplasia. The patient has been described on CT scan to have a spleen size that is either at the upper limit of normal or enlarged. By definition, patients with ITP do not have splenomegaly. In addition, the indication for treatment for ITP is no platelet counts of 75,000, for which the patient received rituximab, but rather the indication is not to treat ITP unless the patient's platelet count drops below 30,000 or the patient is actively bruising, bleeding, or requiring surgery. Therefore, none of this therapy was indicated or medically necessary and, accordingly, it did not meet plan language.

(AR 147). Plaintiff appealed at least a portion of the claims denied in this letter and the decision was upheld.

After Plaintiff filed a second-level appeal in December 2010, UMR again reviewed Plaintiff's claim and explained its denial in a February 11, 2011 letter as follows:

> UMR has conducted a thorough review of your charges for [claims arising from] dates of service 09 13 09 - 09 21 09 . . . 12 01 09 . . . 10 22 10 - 10 26 10 . . . 11 15 10 - 11 19 10 . . . 12 14 10 -12 16 10.
> The review revealed that IVIG and Rituxan from September 2009 through December 2010 as not medically necessary per the Plan language. This agent is recommended for use in setting of severe thrombocytopenia or significant bleeding, two situations in which a rapid platelet response is needed. It can also be used prior to surgery or any other invasive procedure, particularly those that are unplanned, as relatively rapid platelet responses are needed in that situation as well. The records in this case do not specifically indicate that this patient met any of those criteria. Therefore, based on the provided medical records, IVIG cannot be considered medically necessary.
> Rituxan has been studied in the treatment of relapsed ITP with encouraging results. At the time of the events in this case, there were open studies testing the safety and efficacy of Rituxan for the treatment of ITP. Given the existence of ongoing clinical trials at the time of the events in this case, Rituxan meets the health plan definition of experimental/investigational therapy []. Given that Rituxan meets the health plan definition of experimental/investigational, it cannot be considered medically

necessary in this case.
This medical decision was made by MES Group, a licensed, URAC-accredited medical review organization.

(AR 113-14).   Another letter was sent from UMR to Plaintiff on March 2, 2011 explaining its denial for services rendered after the time period relevant here.   It included essentially identical language to the language in the February 11th letter.   The letters from UMR to Plaintiff all referred Plaintiff to the provisions of the SPD regarding Plaintiff's rights under ERISA providing for review.

On March 21, 2011, Plaintiff's counsel then sought the information listed above, including the name and credentials of the medical professional who reviewed the records, an outline of the records they reviewed, and copies of their medical opinions (AR 98).   A UMR Appeals Examiner received the letter and responded on April 1, 2011, explaining she would send counsel the information within the week.   On April 13, 2011, she forwarded a copy of the 2010 SPD.   Her letter states she also enclosed medical records, although Plaintiff states no such records were enclosed and the administrative record likewise does not reflect any record enclosures.   The letter also stated the examiner did not have the name of the reviewing physician, but noted the reviews are completed by MES Group.

Over the course of the next few months, Plaintiff continued to send letters to UMR seeking the requested information.   Those letters are not in the administrative record.   Plaintiff also states UMR responded on July 1, 2011 stating all documentation related to the case had been sent to Plaintiff.   That letter also is not in the administrative record.   On August 2, 2011, Plaintiff's counsel sent a letter to UMR stating UMR had failed to send the requested information and Plaintiff would pursue recourse in federal court.   Plaintiff notified UMR it would seek compensation for the unpaid claims as well as penalties under 29 U.S.C. § 1132(c) for the failure to provide the requested

20

information.  Plaintiff sent another letter on November 9, 2011 amending its prior letter and

confining the inquiry to three claims between November 16, 2009 and January 31, 2010.  It again

advised it would seek recourse in federal court.

The Court concludes UMR provided adequate notice to Plaintiff of its reasons for denial.

As one court observed,

> Plaintiff appears to be contending that notice under § 1133 means providing copies
> of all the medical evidence upon which the Plan relied in making its determination.
> The Court is aware of no authority that would support such a contention. Notice
> under § 1133 of the specific reasons for denial has never been interpreted by the
> courts to require a Plan to provide the claimant with a copy of the full administrative
> record. Neither does notice require a Plan to explain its actions in response to
> demands presented by Plaintiff or her counsel.

*Dutton v. Unum Provident Corp./Paul Revere Co.*, 170 F. Supp. 2d 754, 760 (W.D. Mich. 2001).

The record in this case shows UMR properly notified Plaintiff of the grounds for its denial; that is,

the treatment was not medically necessary both because the record under review did not indicate the

patient had ITP and the Rituxan was experimental or investigational.

The Court must also consider the second purpose of § 1133: "[P]rovid[ing] the claimant an

opportunity to have that decision reviewed by the fiduciary."[5]  *Wenner*, 482 F.3d at 882.  In order

to have a full and fair review, a beneficiary should "'know[] what evidence the decision-maker

relied upon, hav[e] an opportunity to address the accuracy and reliability of that evidence, and hav[e]

the decision-maker consider the evidence presented by both parties prior to reaching and rendering

his decision.'" *Marks v. Newcourt Credit Grp., Inc.*, 342 F.3d 444, 461 (6th Cir. 2003) (quoting

*Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 689 (7th Cir. 1992)); *see also Houston v. Unum Life*

---

[5] For the reasons discussed below in the discussion of Plaintiff's fiduciary duty argument, UMR is a fiduciary under the Plan.

*Ins. Co. of Am.*, 246 F. App'x 293, 300 (6th Cir. 2007) (citing *Halpin* for this proposition). As Plaintiff's complaint and brief focus almost entirely on certain documents it was denied after the appeals process, this consideration constitutes the thrust of Plaintiff's ERISA claim.

"[I]n the context of an administrative appeal of an adverse benefits determination," the Sixth Circuit has noted,

> 29 C.F.R. § 2560.503-1(h)(2) outlines the essential procedural requirements for a full and fair review. These procedural requirements include (1) the allowance of 60 days, after notification of an adverse benefit determination, in which a claimant may file an administrative appeal; (2) the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits; (3) the right to be provided, upon request and free of charge, reasonable access to and copies of all documents, records, and other information relevant to the claim for benefits; and (4) the requirement that the fiduciary take into account all comments, documents, records, and other information submitted by the claimant relating to the claim, regardless of whether such information was submitted or considered in the initial benefit determination.

*Balmert v. Reliance Standard Life Ins. Co.*, 601 F.3d 497, 502 (6th Cir. 2010) (citation omitted). Plaintiff alleges it did not receive, after request, an outline of the specific records reviewed and a description of any records that would be necessary in order to approve the treatment. Plaintiff also argues it was entitled to the actual medical report prepared by the medical professional. Although Plaintiff cites to 29 C.F.R. § 2560.503-1(h)(3)(iii) and (v),[5] neither of these sections requires disclosure of documents or records. Rather, they both contain requirements for medical

---

[5] In addition to these regulations, Plaintiff sought this information pursuant to 29 CFR § 2560.503-1(g)(1)(v)(B). However, 29 CFR § 2560.503-1(g)(1)(v)(B) provides "[i]f the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request." The letters, as discussed above, adequately explained the clinical judgment and applied the Plan to the patient's medical circumstances. This section of the regulation does not otherwise provide for relevant documentation, as does subsection (h)(2)(iii).

22

professionals, such as limiting what kind of information they may consider and prohibiting them from being involved in the initial benefits determination. Presumably Plaintiff's argument it was entitled to the records is based on 29 C.F.R. § 2560.503-1(h)(2)(iii), which provides for access to all documents, records, and information relevant to the initial benefits determination. Indeed, Plaintiff also cites to 29 C.F.R. § 2560.503-1(m)(8), which defines what constitute such "relevant" materials under 29 C.F.R. § 2560.503-1(h)(2)(iii). *See* 29 C.F.R. § 2560.503-1(h)(2)(iii) ("Whether a document, record, or other information is relevant to a claim for benefits shall be determined by reference to paragraph (m)(8) of this section.").

In addition to 29 C.F.R. § 2560.503-1(h)(2), Defendant was obligated to abide by the requirements of 29 CFR § 2560.503-1(h)(3) ("The claims procedures of a group health plan will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless, in addition to complying with the requirements of paragraphs (h)(2)(ii) through (iv) of this section, the claims procedures [abide by enumerated requirements]."). That section includes another one of the procedural violations alleged here: the failure to "[p]rovide for the identification of medical or vocational experts whose advice was obtained on behalf of the plan in connection with a claimant's adverse benefit determination, without regard to whether the advice was relied upon in making the benefit determination." 29 CFR § 2560.503-1(h)(3)(iv).

The weakness in Plaintiff's case is it did not request the missing information during the appeals process. The Plan provides for a mandatory first-level appeal and a voluntary second-level appeal (AR 543-44). Consistent with the regulations, the Plan allows denied beneficiaries access to a litany of documents and to other information relevant to the initial benefits determination:

23

Covered Persons or their Authorized Representative will be allowed reasonable access to review or copy pertinent documents, at no charge.

Covered Persons may submit written comments, documents, records and other information relating to the claim to explain why they believe the denial should be overturned. This information should be submitted at the same time the written request for a review is submitted.

. . . .

The review will take into account all comments, documents, records and other information submitted that relates to the claim. This would include comments, documents, records and other information that either were not submitted previously or were not considered in the initial benefit decision. The review will be conducted by individuals who were not involved in the original denial decision and are not under the supervision of the person who originally denied the claim.

If the benefit denial was based in whole or in part on a medical judgment, the Plan will consult with a health care professional with training and experience in the relevant medical field. This health care professional may not have been involved in the original denial decision, nor be supervised by the health care professional who was involved. If the Plan has obtained medical or vocational experts in connection with the claim, they will be identified upon the Covered Person's request, regardless of whether the Plan relies on their advice in making any benefit determinations.

(*Id.* at 278, 543). Plaintiff did offer new information for consideration during the process related to the patient's condition after the time period relevant here. But Plaintiff has pointed to nothing in or out of the record[6] to suggest it sought the missing documentation prior to the March 21, 2011 letter to UMR.

Part of the confusion in this case is the failure of the parties to identify which claims are relevant to the time period at issue and which appeals correspond to those claims. Even considering those shortcomings, however, it is clear to the Court both levels of appeal provided by the Plan had

---

[6] Although a district court should typically not receive new evidence in ERISA cases, an exception to that rule arises when "consideration of that evidence is necessary to resolve an ERISA claimant's procedural challenge to the administrator's decision." *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 618 (6th Cir. 1998). Plaintiff has accused Defendant of producing an incomplete record, but it has not sought discovery or submitted new evidence. As discussed below, the Court concludes remand would be futile in this case because the Court has sufficient information to find in Defendant's favor without the alleged missing materials.

24

been exhausted before the missing documentation was sought for at least some of the claims (*see* AR 98) (referring to the February 11, 2011 letter and requesting the missing documentation). Moreover, Plaintiff seeks relief for claims between November 2009 and January 2010. As noted, the first time Plaintiff sought the documentation complained-of here was over one year later, on March 21, 2011. Any claim that did not receive a first or second appeal would have been well outside of the Plan's appeal time frame by the time this information was first requested (AR 543) (requiring an initial appeal be made within 180 days of the initial denial and a second appeal be made within 60 days of the denial of the first appeal); (*id*. at 544) (providing at most 60 days to resolve an initial appeal). Plaintiff has not pointed to or alleged any appeal pending during the time the information was sought. Indeed, one of the letters in the correspondence between counsel and UMR, in which the missing documentation was requested, acknowledges the appeals period had passed (AR 437) (wherein counsel continues to seek the missing documentation and notes "[g]iven that all levels of appeal directly to the Plan have been exhausted and the Plan continues to rely on its original adverse benefit determination, the facility has no choice but to pursue this matter in federal court").

The Court concludes Plaintiff's claim must fail because it did not request the information during the pendency of the appeal period. "A claimant's failure to fully explore and exercise [its] procedural rights does not undermine the fundamental fairness of an otherwise full and fair administrative review process." *Balmert*, 601 F.3d at 502. Consistent with this principle, when the information not provided as required by 29 C.F.R. § 2560.503-1 was only sought after the "final determination" of the plaintiff's claim, the plaintiff has not been denied a full and fair review of its claim. *See Maynor v. Hartford Life Grp. Ins. Co.*, No. 2:07-CV-244, 2009 WL 2601866, at *7 (E.D.

Tenn. Aug. 20, 2009) ("If this information had been sought and then denied during the pendency of her appeal, then this would be a close case. However, the plaintiff did not seek this information at that time, and she was informed that she could submit any information for the defendants to consider prior to its final determination. Thus, in terms of her procedural argument, this Court cannot find that the defendant denied plaintiff a full and fair review by allegedly denying her access to information after the final determination which she did not seek."). As the court in *Maynor* concluded, if the opportunities for review by the fiduciary had all passed, the documentation requested post-review could not have caused a failure "to provide the claimant an opportunity to have that decision reviewed *by the fiduciary*." *See Wenner*, 482 F.3d at 882 (emphasis in original); *see also Balmert*, 601 F.3d at 502-03 (denying a full and fair review claim because the plaintiff did not request the report she claimed she was denied). Indeed, Plaintiff offered new information during the appeals process, which was considered by UMR. It was not until after UMR concluded the claims should be denied for a second and final time that Plaintiff sought the information forming the basis of its ERISA claim. Accordingly, Plaintiff was not denied a full and fair review of its claim.

Admittedly, 29 CFR § 2560.503-1(h)(3)(iv) does not explicitly contain a request requirement, while 29 CFR § 2560.503-1(h)(2)(iii) does . Subsection (h)(3)(iv) requires "[t]he claims procedures" of a group health plan to "[p]rovide for the identification of medical or vocational experts whose advice was obtained on behalf of the plan in connection with a claimant's adverse benefit determination, without regard to whether the advice was relied upon in making the benefit determination." 29 CFR § 2560.503-1(h)(3)(iv). The Court concludes, as have a number of other district courts, a plan with procedures that "provide[] for" the identification of these experts upon request satisfies the regulation; the regulations do not require explicit disclosure of those

experts in the denial letter. *See, e.g.*, *Walker v. Kimberly-Clerk Corp.*, No. 1:08CV146–SA–JAD, 2010 WL 611007, at *10 (N.D. Miss. Feb. 17, 2010) ("The regulation does not explicitly require those names to be reported to the claimant, only that a procedure for obtaining the medical consultant's identity be available."); *Orr v. Metro. Life Ins. Co., Inc.*, No. 1:CV-04-0557, 2007 WL 2702929, at *15 (M.D. Pa. Sept. 13, 2007) ("We do not read the regulation, however, to require explicit disclosure of such individuals in a denial letter."); *Agnew v. Verizon Wireless Short Term Disability Plan*, No. 8:06-2159, 2007 WL 1120411, at *4 (D.S.C. Apr. 13, 2007) ("[T]he claims procedures of the Plan clearly provided for the identification of medical experts whose advice was obtained on behalf of the plan in connection with an adverse benefit determination. . . . Therefore, Agnew's argument that the Plan did not provide for the identification of medical experts is without merit.") (citation omitted); *Provencio v. SBC Disability Income Plan*, No. SA-05-CA-0032-WWJ, 2006 WL 3927168, at *8 (W.D. Tex. Dec. 6, 2006) ("Provencio reads this regulation as a requirement that the plan administrator identify the plan's medical expert directly to the claimant, before the conclusion of an administrative appeal. The express language of the regulation, however, merely requires the plan administrator to 'provide for' the identification of a medical expert."); *see also Lafleur v. La. Health Serv. & Indem. Co.*, 563 F.3d 148, 156 (5th Cir. 2009) (finding the fiduciary failed to comply with 29 CFR § 2560.503-1(h)(3)(iv) because it did not identify the medical expert relied upon after the plaintiff "specifically requested" the information prior to the pendency of the administrative appeal). Here, as noted above, the Plan provides the following procedure for obtaining the identification of health care professionals who were retained by UMR in consideration of a beneficiary's claim.

> If the benefit denial was based in whole or in part on a medical judgment, the Plan will consult with a health care professional with training and experience in the

27

relevant medical field. This health care professional may not have been involved in the original denial decision, nor be supervised by the health care professional who was involved. If the Plan has obtained medical or vocational experts in connection with the claim, they will be identified upon the Covered Person's request, regardless of whether the Plan relies on their advice in making any benefit determinations.

(AR 278, 543). The Plan, therefore, contains procedures by which a denied beneficiary may obtain the identities of any medical or vocational experts retained "in connection with the claim" regarding "any benefit determinations." These procedures satisfy the regulation. Of course, UMR failed to respond to Plaintiff's request for documents. It did so, however, *after* the period for UMR's review. These procedures, which call for a request to come before or during the pendency of the appeal, were not violated by UMR's failure to provide documentation following its final determination. Accordingly, UMR did not deprive Plaintiff a "full and fair review" of its claim because the review period had ended prior to Plaintiff's request for documentation. *See Balmert*, 601 F.3d at 502-03; *Maynor*, 2009 WL 2601866, at *7.

Moreover, relief for a violation of § 1133 is equitable. 29 U.S.C. § 1132(a)(3). The appropriate remedy would not be the damages sought by Plaintiff. Rather, at best Plaintiff would be entitled to a remand to allow Plaintiff to pursue the merits of its claim. *See Wenner*, 482 F.3d at 883-84 ("A plaintiff denied any benefits at all has no expectation of receiving them unless her claim is meritorious, and thus returning her to the status quo prior to the § 1133 violation requires only curing the procedural violation so that she may fairly pursue the merits of her claim."). Because the Court concludes UMR substantially complied with the twin purposes of § 1133, remand is not necessary. *See Dutton*, 170 F. Supp. 2d at 761 ("[T]he Sixth Circuit noted in *Kent* that remand would not be required where it would represent a 'useless formality.'") (quoting *Kent v. United of Omaha Life Ins. Co.*, 96 F.3d 803, 807 (6th Cir. 1996)).

28

### 3. Fiduciary Duty

Plaintiff also claims in its brief, although not in its complaint, that Defendants breached fiduciary duties in their failure to provide a "full and fair review" of the claim denial, based on the inadequacies of the process claimed by Plaintiff and discussed above.

Initially, the Court notes UMR, although not explicitly accorded fiduciary status by the Plan, did owe Plaintiff a fiduciary duty pursuant to ERISA. "ERISA provides that 'not only the persons named as fiduciaries by a benefit plan, *see* 29 U.S.C. § 1102(a), but also anyone else who exercises discretionary control or authority over the plan's management, administration, or assets, *see* § 1002(21)(A), is an ERISA 'fiduciary.'" *Moeckel v. Caremark RX Inc.*, 385 F. Supp. 2d 668, 682 (M.D. Tenn. 2005) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251 (1993)). This definition is "functional . . . and does not turn on formal designations such as who is the trustee." *Smith v. Provident Bank*, 170 F.3d 609, 613 (6th Cir. 1999). Because the definition of an ERISA fiduciary "includes anyone who 'exercises any discretionary authority or discretionary control respecting management of [the] plan or exercises any authority or control respecting management or disposition of assets,'" UMR is a fiduciary under the Plan. *Smith*, 170 F.3d at 613 (quoting 29 U.S.C. § 1002(21)(A)); *see also id.* ("To the extent that Provident delegated duties and powers to Cowen and Cambron, they personally could become ERISA fiduciaries and be liable under § 1132(a)(2).").

ERISA requires a "fiduciary [to] discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104. However, "[t]o prevail on a breach-of-fiduciary-duty claim under ERISA, a plaintiff must generally prove that the defendant not

only breached its fiduciary duty but also caused harm by that breach." *Maynor*, 2009 WL 2601866, at *5 (citing *Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995)); *see also Kuper*, 66 F.3d at 1459 (holding § 1104 contains a causation requirement); *Pfeil v. State St. Bank & Trust Co.*, 671 F.3d 585, 596-97 (6th Cir. 2012). *But see Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 438-39 (6th Cir. 2002) (recognizing *Kuper* found a causal link requirement in § 1104 but declining to extend that requirement to violations of § 1106).

Here, because, as discussed above, Plaintiff did not request the omitted information during the pendency of its appeal before UMR or during its initial determination, there is no causal connection between UMR's failure to provide the information and its denial of benefits. *See Maynor*, 2009 WL 2601866, at *6 ("It is worth noting that there is no indication in the record that the plaintiff asked for this information during the pendency of her appeal or prior to the final decision. . . . The plaintiff has not demonstrated that she is entitled to this information, but more importantly, she has failed to show a causal connection between the alleged breach and her denial of benefits."). Plaintiff's breach of fiduciary duty claim, to the extent the Court considers a claim not made in the complaint, thus fails.

### 4. Attorney's Fees

Plaintiff seeks attorney's fees and costs pursuant to 29 U.S.C. § 1132(g)(1), which provides discretion to the Court to "allow a reasonable attorney's fee and costs of action to either party." Defendants' only argument opposed to the imposition of attorney's fees under § 1132(g)(1) is that Plaintiff is not a "participant, beneficiary, or fiduciary" under the Plan and is therefore precluded from obtaining such an award. However, as noted above, the Court concludes Plaintiff is validly acting as the patient's authorized representative.

30

Moreover, ERISA defines "beneficiary" as "a person designated by a participant . . . who is or may become entitled to a benefit [under a covered plan]." 29 U.S.C. § 1002(8); *see also Crawford v. Roane*, 53 F.3d 750, 754 (6th Cir. 1995) ("[W]e hold that one is a 'beneficiary' under § 1002(8) only if he has a reasonable or colorable claim for benefits under an ERISA plan . . . ."); *Kennedy v. Conn. Gen. Life Ins. Co.*, 924 F.2d 698, 700 (7th Cir. 1991) ("[Section] 1132(a)(1)(B) supplies jurisdiction when a provider of medical services sues as assignee of a participant. ERISA defines a 'beneficiary' as 'a person designated by a participant . . . who is or may become entitled to a benefit' under the plan.") (quoting 29 U.S.C. § 1002(8)). Plaintiff's § 1132 action is brought under § 1132(a)(3)(B) and is an action covered by § 1132(g)(1). Accordingly, Plaintiff may seek attorney's fees under § 1132(g)(1).

However, Plaintiff is not entitled to attorney's fees in this case. Although the Court previously concluded § 1132(g) did not contain a prevailing party requirement, *McKay v. Reliance Standard Life Ins. Co.*, 654 F. Supp. 2d 731, 736 (E.D. Tenn. 2009), the Supreme Court subsequently concluded "a fees claimant must show 'some degree of success on the merits' before a court may award attorney's fees under § 1132(g)(1)," *Hardt v. Reliance Standard Life Ins. Co.*, 130 S. Ct. 2149, 2158 (2010). Accordingly, because the Court denies Plaintiff's claim under § 1133, an award of attorney's fees would be inappropriate.

### 5. Section 1132(c) Damages

For the first time in its brief, Plaintiff seeks statutory damages under 29 U.S.C. § 1132(c), which provides a plan administrator who fails to provide certain documents required by ERISA or who refuses to comply with a request for information as required by ERISA will be subject to statutory damages in the amount of $100 per day. However, as Defendants correctly note, "[i]t is

well established that only plan administrators are liable for statutory penalties under § 1132(c)." *Caffey v. Unum Life Ins. Co.*, 302 F.3d 576, 584 (6th Cir. 2002). ERISA defines "administrator" as the "plan sponsor" unless otherwise specified in the plan, 29 U.S.C. § 1002(16)(A)(ii), and, where a plan is maintained by a single employer, the plan sponsor is the employer, 29 U.S.C. § 1002(16)(B)(i). Here, not only is CPC Logistics explicitly defined as the plan administrator in the Plan (AR 442), but it otherwise meets the definition of plan administrator in ERISA. Because CPC Logistics is not a defendant in this case, Plaintiff cannot seek statutory damages pursuant to § 1132(c).

The Court notes, however, when a third-party administrator performs all the functions of a plan administrator some courts have found it liable under § 1132(c). *See, e.g.*, *Logan v. Unicare Life & Health Ins., Inc.*, No. 05-72928, 2007 WL 1875943, at *4 (E.D. Mich. June 25, 2007) (rejecting the argument the third-party administrator was not liable because "all of Compsystem's duties were performed by MMBM employees, and the decision to not provide Plaintiff with the requested documents was made by a MMBM employee"); *Hill v. Metro. Life Ins. Co.*, 327 F. Supp. 2d 886, 890 (E.D. Tenn. 2004) (noting the plaintiff's argument the defendant should be held liable under § 1132(c) because it acted as the plan administrator's delegate and performed the relevant violations, but declining to decide the issue because the court need not exercise its discretionary authority to impose damages). The argument may be more persuasive here, where UMR is explicitly named a third party administrator in the Plan.

However, even if the Court were to consider UMR an administrator for the purposes of § 1132(c), Plaintiff's claim would still fail. First, a violation of § 1133 may not serve as the basis for § 1132(c), because the former imposes requirements on plans whereas the latter imposes

requirements on plan administrators. *Stuhlreyer v. Armco, Inc.*, 12 F.3d 75, 79 (6th Cir. 1993). Some courts have concluded violations of regulations that themselves impose requirements on plan administrators, such as 29 CFR § 2560.503-1(g)(1)(v)(B) at issue here, may serve as a basis for § 1132(c) liability. *See Kleinhans v. Lisle Savings Profit Sharing Trust*, 810 F.2d 618 (7th Cir. 1987) (concluding a violation of 29 CFR § 2560.503-1(f) (1977) could serve as a basis for § 1132(c) liability because it imposed a duty on plan administrators). Other courts have concluded no regulatory violation under § 1133 can serve as a basis for § 1132(c) damages. *See Groves v. Modified Retirement Plan*, 803 F.2d 109, 116-18 (3d Cir. 1986) (concluding violations of § 1133's implementing regulations cannot serve as bases for § 1132(c) damages because of the penal nature of § 1132(c) and the fact it only applies to duties imposed "by this subchapter," not by implementing regulations); *see also Jordan v. Tyson Foods, Inc.*, 312 F. App'x 726, 735-37 (6th Cir. 2008) (discussing both *Kleinhans* and *Groves* and concluding the regulation at issue in *Jordan* was not covered by § 1132(c) regardless, but noting it is unclear whether *Kleinhans* is still good law in the Seventh Circuit). Because the Sixth Circuit cast doubt on those decisions holding violations of § 1133's implementing regulations can serve as the basis for § 1132(c) damages, *Jordan*, 312 F. App'x at 735-37, the Court concludes Plaintiff is not entitled to such damages in this case.

Second, as previously discussed, UMR did not violate the regulations.[7] Section 1132(c) only provides damages if an administrator "fails or refuses to comply with a request for any information which such administrator is *required by this subchapter* to furnish to a participant or beneficiary." The regulations require the missing documents to be provided in order to ensure a full and fair

---

[7] The SPD, which was also requested, was required to be sent to Plaintiff upon request by 29 U.S.C. § 1024(b)(4). However, the SPD was in fact sent within thirty days, as required by § 1132(c).

33

review of a beneficiary's claim. Plaintiff did not seek the missing documents until after the appeals period. Because the review period had ended, Plaintiff had been afforded a full and fair review of its claim and UMR was no longer required to provide the missing documents pursuant to those regulations. If some other provision of law required UMR to provide the documents and information after its final determination, Plaintiff has not identified it.

### B. State Claims

The parties did not discuss the state claims of breach of contract, promissory estoppel, and negligent misrepresentation in their briefs. The Court must consider whether these claims are preempted by ERISA. At oral argument, Plaintiff's counsel conceded these claims are likely preempted. The Court will consider the issue regardless, but does so without the benefit of counsel's input.

As an initial matter, there are two types of ERISA preemption. Complete preemption is an exception to the well-pleaded complaint rule and provides a basis for federal court jurisdiction over state law claims that could have been brought under § 1132. *See Loffredo v. Daimler AG*, 500 F. App'x 491, 495 (6th Cir. 2012). The Court need not consider the complete preemption issue because, although not alleged in the complaint, it appears the Court has an independent basis for jurisdiction under the diversity statute, 28 U.S.C. § 1332, or supplemental jurisdiction based on Plaintiff's ERISA claims, 28 U.S.C. § 1367.

The other type of ERISA preemption, at issue here, is called "express" preemption. *Loffredo*, 500 F. App'x at 495; *Thurman v. Pfizer, Inc.*, 484 F.3d 855, 860-61 (6th Cir. 2007); *see also Conn. State Ass'n v. Anthem Health Plans, Inc.*, 591 F.3d 1337, 1344 (11th Cir. 2009) (referring to preemption under § 1144 as "conflict" or "defensive" preemption). ERISA's preemption provision

34

preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" governed by ERISA. 29 U.S.C. § 1144(a); *see also Thurman*, 484 F.3d at 861. "[T]he express pre-emption provisions of ERISA are deliberately expansive, and designed to 'establish pension plan regulation as exclusively a federal concern.'" *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 45-46 (1987) (quoting *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 523 (1981)). A state law "'relate[s] to' a benefit plan 'in the normal sense of the phrase, if it has a connection with or reference to such a plan.'" *Id.* at 47 (quoting *Metro. Life Ins. Co. v. Mass.*, 471 U.S. 724, 739 (1985)).

Considering the "purpose of ERISA preemption was to avoid conflicting federal and state regulation and to create a nationally uniform administration of employee benefit plans," *Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp. (PONI)*, 399 F.3d 692, 698 (6th Cir. 2005), the Sixth Circuit has recognized three categories of state law that are clearly preempted by ERISA: "state-law claims that (1) mandate employee benefit structures or their administration; (2) provide alternate enforcement mechanisms; or (3) bind employers or plan administrators to particular choices or preclude uniform administrative practice, thereby functioning as a regulation of an ERISA plan itself," *Thurman*, 484 F.3d at 861 (internal quotation marks omitted). The Sixth Circuit has also acknowledged a fourth category, "those [claims] seeking 'remedies for misconduct growing out of the administration of' an ERISA plan." *Steele v. United Parcel Serv, Inc.*, 499 F. Supp. 2d 1035, 1040 (E.D. Tenn. 2007) (quoting *Briscoe v. Fine*, 444 F.3d 478, 497(6th Cir.2006) (citing *David P. Coldesina, D.D.S. v. Estate of Simper*, 407 F.3d 1126, 1136 (10th Cir. 2005)).

"Congress did not intend, however, for ERISA 'to preempt traditional state-based laws of general applicability that do not implicate the relations among the traditional ERISA plan entities,

35

including the principals, the employer, the plan, the plan fiduciaries, and the beneficiaries.'" *PONI*, 399 F.3d at 698 (quoting *LeBlanc v. Cahill*, 153 F.3d 134, 147 (4th Cir.1998)). Some state laws affect ERISA plans "in a way that is 'too tenuous remote or peripheral' to say that they 'relate to' the plan." *Thurman*, 484 F.3d at 861 (quoting *Shaw v. Delta Air Lines*, 463 U.S. 85, 100 n.21 (1983)). The Sixth Circuit requires a court to consider "whether the remedy sought by a plaintiff is primarily plan-related." *Id.*

Here, Plaintiff's claims relate to an alleged agreement between UMR and Plaintiff. Plaintiff points to the precertification of the patient by UMR and argues the precertification constitutes an independent contract between the parties. The complaint specifically disclaims the agreement rises under the Plan, and states "[t]he Contract arises, not as a result of an insurance contract between defendants and their insured, but as a result of defendants' independent promise to PMC for payment of medical services provided to defendants' insured." In the alternative, Plaintiff seeks enforcement of the agreement on a promissory estoppel theory or damages for negligent misrepresentation.

The question for the Court is, assuming the precertification constitutes any of the torts claimed by Plaintiff, whether the alleged action by UMR sufficiently "relate[s] to" the Plan that the claim is preempted by § 1144.

The Court has already concluded UMR acted as a plan fiduciary when it was handling Plaintiff's claim. The Court also concluded Plaintiff was, in fact, a beneficiary assigned by the patient to receive benefits. Plaintiff's victories on these questions appear to be pyrrhic. Because UMR was acting as a plan fiduciary, and Plaintiff was acting as a plan beneficiary, Plaintiff's state claims "implicate the relations among the traditional ERISA plan entities." *PONI*, 399 F.3d at 698. Congress's broad preemption mandate conflicts with such a law, and Plaintiff's claims are therefore

36

preempted. *See Hutchison v. Fifth Third Bancorp*, 469 F.3d 583, 590 (6th Cir. 2006) ("Most strikingly, the instant case differs from *PONI* in that plaintiffs' claim implicates relations among traditional ERISA plan entities. Fifth Third is an ERISA plan fiduciary and it is Fifth Third's amendment of the plan that is directly challenged, not just implicated, in this suit."); c*f. Kloots v. Am. Express Tax & Bus. Servs., Inc.*, 233 F. App'x 485, 488 (6th Cir. 2007) (noting "the district court's uncontested determination that defendants are not fiduciaries relative to the ESOP or its beneficiaries . . . drives much of our analysis"); *PONI*, 399 F.3d at 699 (concluding a state law claim was not preempted because it was made against "non-fiduciary service providers").

To the extent Plaintiff's complaint separates its claim under the assignment of benefits and its state law claims, the Court's conclusion is unaffected by the timing of UMR's alleged promise. The Sixth Circuit has stated

> [a]ffirmance [of the district court's ruling] is required [when] plaintiffs seek damages for the ERISA-regulated actions of an ERISA fiduciary, based on an alleged contract that the fiduciary entered into before it became a fiduciary with respect to plaintiffs. ERISA preempts in that situation because the state-law contract claim would bind fiduciaries to particular choices, thereby functioning as a regulation of the ERISA plan.

*Hutchison*, 469 F.3d at 587-88. Such is the claim at issue here. The state law contract claim, and for that matter, the promissory estoppel claim, attempt to bind the ERISA fiduciary to a particular choice: to pay Plaintiff for services rendered pursuant to the plan. Binding an administrator to a choice is one of the three categories the Sixth Circuit has identified as preempted by ERISA. *See Thurman*, 484 F.3d at 681. Plaintiff's claims are therefore preempted by ERISA.

Moreover, the Sixth Circuit has concluded claims similar to these claims are preempted by ERISA. In *Cromwell*, 944 F.2d at 1274, the plaintiffs, doing business as a home health care company, agreed to provide services to a patient covered under an employee plan through her

37

husband's employment. Prior to agreeing to provide care to the patient, the plaintiffs contacted the defendant, administrator of the health plan, and verified the patient's coverage and that the specific type of care would be covered under the plan. *Id.* at 1274-75. After receiving assurance of coverage, the plaintiff provided the needed care to the patient. *Id.* at 1275. The defendant paid the plaintiff for care rendered until the patient's husband was terminated and was no longer eligible for benefits. Plaintiffs, however, were unaware of this event and defendant did not notify them. Rather, defendant simply stopped paying plaintiffs' claims. *Id.* When plaintiffs inquired why they were not being paid, defendant informed them there was a dispute regarding the coverage. Sometime thereafter, defendants paid the patient's husband the outstanding balance for services, rather than plaintiffs directly, even though the patient's husband had signed an assignment of benefits. *Id.*

The Sixth Circuit concluded a plaintiff's state law claims of breach of contract, promissory estoppel, negligent misrepresentation, and breach of good faith were preempted. The court noted "[i]t is not the label placed on a state law claim that determines whether it is preempted, but whether in essence such a claim is for the recovery of an ERISA plan benefit." *Id.* at 1276. The court concluded

> [a]ppellants' complaint alleged promissory estoppel, breach of contract, negligent misrepresentation, and breach of good faith as grounds for the recovery of benefits from the [defendant's] plan for health care services rendered to the [patient]. Thus, appellants' state law claims are at the very heart of issues within the scope of ERISA's exclusive regulation and, if allowed, would affect the relationship between plan principals by extending coverage beyond the terms of the plan. Clearly, appellants' claims are preempted by ERISA.

*Id.*

This is relevant to the Court's determination. Plaintiff, although it attempts to separate its state claims from its ERISA claim and the underlying plan, is claiming UMR precertified the

38

patient's coverage *under the plan*, and agreed Plaintiff would be paid *pursuant to the plan*. Although the complaint muddles the language, stating both "[Plaintff] accepted and treated the Patient as a patient represented to be covered under the Plan" and "Defendant made an independent promise to pay [Plaintiff] for the services rendered," the filings demonstrate Plaintiff obtained precertification of benefits coverage and treated the patient accordingly.[8]   Under *Cromwell*, Plaintiff's attempt to recover benefits for "health care services rendered" goes to the "very heart of issues within the scope of ERISA's exclusive regulation." *Cromwell*, 944 F.2d at 1276.  Plaintiff's state claims are therefore preempted.

    *Cromwell* conflicts with the conclusion of a number of other circuits. *See, e.g.*, *Franciscan Skemp Healthcare, Inc. v. Cent. States Joint Bd. Health & Welfare Trust Fund*, 538 F.3d 594, 600 (7th Cir. 2008) (disagreeing with *Cromwell* as "somewhat of an exception to the trend" and concluding claims of negligent misrepresentation and estoppel were not *completely* preempted but declining whether to determine if it was expressly preempted); *In Home Health, Inc. v. Prudential Ins. Co. of Am.*, 101 F.3d 600, 605 (8th Cir. 1996) (noting the majority of circuits "have concluded the providers' state law claims are not preempted by ERISA" and distinguishing *Cromwell* because the plaintiff was not seeking benefits as an assignee of a beneficiary); *Memorial Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 246 (5th Cir. 1990) (concluding on similar facts to this case third party providers' claims against fiduciaries are not preempted); *Cromwell*, 944 F.2d at 1283-84 (Jones, J., dissenting) (citing *Memorial Hospital* as the appropriate analysis).  The Court notes, however, while *Cromwell* appears to be the minority among the circuits, it does appear to be good

_____

[8] However, as discussed below in regard to equitable estoppel, the filings submitted to demonstrate precertification are ambiguous.

39

law. *See McLemore v. Regions Bank*, 682 F.3d 414, 425 (6th Cir. 2012) (citing *Cromwell* as authority); *Steele v. United Parcel Serv, Inc.*, 499 F. Supp. 2d 1035, 1040 (E.D. Tenn. 2007) (citing *Cromwell* as authority but concluding it did not control the issue presented). Accordingly, although other circuits might disagree, the Court must apply *Cromwell* and concludes Plaintiff's state claims are preempted.

## C. Equitable Estoppel

Equitable estoppel, however, is a valid claim under ERISA. *See Bloemker v. Laborer's Local 265 Pension Fund*, 605 F.3d 436, 440 (6th Cir. 2010). Plaintiff's promissory estoppel argument could be construed as a claim of equitable estoppel. *See id.* ("We have recognized that 'equitable estoppel may be a viable theory in ERISA cases,' and have treated promissory estoppel in the same way.") (quoting *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 403-04, 403 n.13 (6th Cir. 1998)). Although the complaint appears most naturally to be read as raising a state law promissory estoppel claim, it could be read as ambiguously raising an ERISA equitable estoppel claim.

In order to establish an equitable estoppel claim, a plaintiff must demonstrate

1) conduct or language amounting to a representation of material fact; 2) awareness of the true facts by the party to be estopped; 3) an intention on the part of the party to be estopped that the representation be acted on, or conduct toward the party asserting the estoppel such that the latter has a right to believe that the former's conduct is so intended; 4) unawareness of the true facts by the party asserting the estoppel; and 5) detrimental and justifiable reliance by the party asserting estoppel on the representation.

*Id.* at 442. "[E]stoppel 'cannot be applied to vary the terms of the unambiguous plan documents.'"

*Id.* at 443 (quoting *Sprague*, 133 F.3d at 404).

There are at least two reasons not to apply equitable estoppel in this case. First, the evidence Plaintiff provides regarding the "promise" to pay for services rendered is unclear. Plaintiff points

to UMR's log notes reflecting a precertification inquiry on November 16, 2009 (AR 2). The notes

do reflect such an inquiry, but the comments also states "no precert req; only for admit" (*id.*). The

contents of this representation are unknown to the Court, and the parties have not provided any

additional information sufficient to justify application of equitable estoppel.

Second, reliance on the representation must be reasonable. A "party's reliance can seldom,

if ever, be reasonable or justifiable if it is inconsistent with the clear and unambiguous terms of plan

documents available to or furnished to the party." *Sprague*, 133 F.3d at 404. In this case, the Plan

explicitly states the following in regard to "Pre-Service Claim[s]":

> [A Pre-Service Claim] is a claim for a benefit where the Covered Person is required
> to get approval from the plan ***before*** obtaining the medical care such as in the case
> of notification of health care items or service that the Plan requires. If a Covered
> Person or provider calls the Plan to find out if a claim will be covered, that is not a
> Pre-Service Claim, unless the Plan and this SPD specifically require the person to
> call for notification. Giving notification does not guarantee that the Plan will
> ultimately pay the claim.

(AR 539) (emphasis in original). The "notification" referred to in this section is defined elsewhere

in the Plan as "a determination by [UMR][9] on behalf of the Plan, with respect to whether a service,

treatment, supply or facility is the most appropriate cost effective treatment for the care and

treatment of an Illness or Injury and meets Clinical Eligibility for Coverage" (*id.* at 525). The Plan

reiterates that notification does not guarantee coverage in at least one other provision:

> Even though a Covered Person provides Notification from [UMR], that does not
> guarantee that this Plan will pay for the medical care. The Covered Person still needs
> to be eligible for coverage on the date services are provided. Coverage is also subject
> to all of the provisions described in this document.

(*Id.* at 526).

---

[9] The omitted term "Utilization Management Organization" is listed as "UMR Utilization
Management" (AR 525).

41

Plaintiff has pointed to no provision of the Plan that required it to notify UMR before providing the care.[10] As the above-quoted provision indicates, even where notification is *required* by the Plan, it provides no guarantee of coverage. Courts have rejected estoppel claims where the language of the plan conflicts with the alleged misrepresentation. *See, e.g.*, *Sprague*, 133 F.3d at 404 ("In the face of GM's clearly-stated right to amend—a right contained in the plan to which the plaintiffs had access and in many of the summaries they were given—reliance on statements allegedly suggesting the contrary was not, and could not be, reasonable or justifiable, especially when GM never told the plaintiffs that their benefits were vested or fully paid-up."); *Combs v. Ky. Wesleyan Coll.*, No. 4:05CV-139-JHM, 2008 WL 145253, at *16 (W.D. Ky. Jan. 11, 2008) (holding reliance on statement promising lifetime coverage was unreasonable in light of provision in SPD reserving right to amend or terminate the plan); *Mack v. Blue Cross/Blue Shield of Minn.*, 537 F. Supp. 2d 924, 929 (E.D. Mich. 2008) (holding plaintiff did not reasonably rely on two payments made to her where "the language of the plan is very clear that Plaintiff's no-fault insurance takes primary responsibility for her injuries resulting for a car accident"); *Reinert v. Giorgio Foods, Inc.*, 15 F. Supp. 2d 589, 597 (E.D. Penn. 1998) (holding equitable estoppel inappropriate where the plan clearly indicated the third-party administrator had no authority to guarantee benefits).

Accordingly, to the extent Plaintiff raises it, the Court rejects any possible equitable estoppel claim.

### D. Incomplete Administrative Record

The parties agree the administrative record is incomplete. Namely, Plaintiff contends the

---

[10] Notification is required for inpatient hospital stays (AR 526). Plaintiff asserts the patient in this case was receiving outpatient care.

very documents it now faults Defendants for failing to provide in the review process have still not been provided, as well as some of the letters sent to UMR . When the administrative record is "factually incomplete" remand is appropriate. *Majestic Star*, 581 F.3d at 373 ("Remand therefore is appropriate in a variety of circumstances, particularly where the plan administrator's decision suffers from a procedural defect or the administrative record is factually incomplete."). However, because here the Court can conclude Plaintiff's claims fail based on the administrative record before it, remand is not necessary. Had Plaintiff challenged Defendants' substantive determination, remand for an incomplete record may be appropriate. But because Plaintiff's only ERISA claim is the failure to provide a full and fair review, and the Court concludes that claim fails because Plaintiff did not seek the documents at issue until after Defendants' final determination, remand would be futile. *See Majestic Star*, 581 F.3d at 374 (concluding the district court properly determined an award of benefits was appropriate rather than remand because remand would be "futile"); *see also Loffredo*, 500 F. App'x at 496 (Sutton, J.) (concluding allowing amendment of a complaint would be futile where ERISA exempts the claim at issue from coverage); *Kent*, 96 F.3d at 807 ("[A] remand in this case would represent a useless formality.").

## IV.    CONCLUSION

For the foregoing reasons, Court will **DENY** Plaintiff's motion for judgment on the ERISA record (Court File No. 21).

**An Order shall enter.**

/s/ _____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**